## ANGELO N. AMABILE et ux. *v.* JOSEPH I. WINKLES et ux.

[No. 335, September Term, 1974.]

*Decided January 14, 1975.*

The cause was argued before MORTON, THOMPSON and POWERS, JJ.

*Benjamin Lipsitz*, with whom was *Eleanor Jean Lipsitz* on the brief, for appellants.

*Charles E. Wehland* for appellees.

THOMPSON, J., delivered the opinion of the Court.

Judge James Macgill, sitting in Equity in the Circuit Court for Howard County, found that the appellees, Joseph I. Winkles and Mary Elizabeth Winkles, his wife, were entitled to a right of way 12 feet in width over the lands of the appellants, Angelo N. Amabile and Elisabeth E. Amabile, his wife, and granted an injunction requiring that the Amabiles remove all obstructions from the right of way. On appeal the Amabiles contest not only the existence of the right of way but the propriety of the remedy.

Mr. and Mrs. Winkles are the owners of a lot containing 1.07 acres situated on the north side of Fells Avenue.[1] Their dwelling house is located at the top of a hill and can be reached by vehicles only by the right of way in question which leads to the rear of the property. The only access to the front of the dwelling is by means of 48 steps leading up from Fells Avenue.

Mr. and Mrs. Amabile, the appellants, own adjoining land to the west of the appellees comprising 3.924 acres which lies between Fells Avenue and Court House Drive to the North. In 1908, the land which is owned by all the parties to this

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, May 5, 1975.

1. In the evidence the names of the streets vary somewhat from witness to witness. We have adopted those most generally used.

proceeding was a part of a larger tract known as Linwood Farms belonging to James M. Haines and his wife. By deed dated May 27, 1908, Mr. and Mrs. Haines conveyed to August G. Schotta a 1.168 acre rectangular shaped parcel approximately 110 feet wide and extending from Fells Avenue to what is now Court House Drive. This parcel ran through the center of the Haineses' holdings. In that deed Mr. and Mrs. Haines reserved for the benefit of the remaining property a right of way 12 feet in width without providing a metes and bounds description. The location of the right of way was not otherwise described in the deed, the particular language of which is set out in the margin.[2]

On January 19, 1971, the Winkleses acquired their property from Laura M. Pfeiffer and other heirs of William F. Kirkwood in fee simple. In that deed they were granted "the right of ingress and egress over the right of way 12 feet wide mentioned in the aforesaid deed from Haines to Schotta." In none of the intervening deeds was the right of way claimed by the Winkleses more specifically described.

On December 21, 1967, the Amabiles acquired their property, consisting of the Schotta property as well as part

---

2. "By mutual agreement between the said James M. Haines and wife and the aforesaid August G. Schotta the buildings that may be erected on the property hereby granted and conveyed shall conform with a line heretofore established and determined by a large stone permanently imbedded in the land, and that the said James M. Haines and wife their heirs and assigns shall have access on and over a right of way twelve feet wide to such of the land of the grantors as is contiguous to that hereby granted and conveyed; also the right to construct lay under ground and repair when necessary a pipe line for the purpose of conveying water to any building or buildings that may be erected on the land of said grantors adjoining that hereby granted. The said James M. Haines and wife do furthermore grant and convey unto the said August G. Schotta his heirs and assigns a right of way over the land of which they are now seized and possessed and where they reside said right of way to be twelve feet wide and to be an extension of the present private roadway; also a right of way between the lands of the grantors and the grantee, each contributing one half of the same, in order that delivery wagons shall have access to such buildings as are now or may be erected on the lands of either of the parties hereto, said right of way to be twelve feet wide. Moreover the said James M. Haines and wife hereby grant and convey unto the said August G. Schotta his heirs and assigns the right to construct a pipe line to the reservoir now on the land of the grantors and to draw therefrom water for household purposes, and also to convey by drawn pipes all drainage from the property hereby conveyed into the stream or the run of said property."

of the property retained by Haines in 1908, from Raymond W. Griffith and his wife. Their deed provided that they took the property subject to the right of way reserved in a deed dated May 27, 1908, from James M. Haines and others to August G. Schotta. The right of way is likewise not described with any more particularity in the Amabiles' chain of title.

At the trial below, the Winkleses produced a topographic plat prepared by Purdumn and Jeschke dated December 19, 1967 which showed a roadway leading through Amabiles' property from Fells Avenue to Court House Drive. The plat did not show a roadway leading from the Winkleses' property to the Fells Avenue-Court House Drive road. They also produced a plat made by Leon A. Podolak and Associates dated January 12, 1972, showing the approximate location of a right of way leading from the Winkleses' property to the lane described on the plat previously mentioned and running from Fells Avenue to Court House Drive. The surveyors explained they were unable to locate the original roadway precisely because recent grading and construction had obliterated all signs of what may have been the original roadway.

The trial judge summarized the testimony produced by the Winkleses in the following language:

"The complainants produced a number of witnesses who testified as to their recollection of where the right-of-way was located on the ground. Mr. John Kirkwood said that he was a son of the William F. Kirkwood to whom Mr. Haines had conveyed the property and that his father had erected a house on it in 1910. The witness was born there and remembered the property well before 1920. There were two accesses to the house, one directly from Fells Avenue up a flight of forty-eight steps, and the other from Fells Avenue across the Haines and Schotta properties. The roadway from Fells Avenue went to the Haines and Schotta dwellings and another portion branched

off to the rear of the Kirkwood dwelling [now the Winkleses' property]. This roadway was used for making heavy deliveries, such as coal, furniture and groceries, to the Kirkwood home since the only other way to reach it was by the flight of steps up the steep slope from Fells Avenue. During the years 1968 to 1971, according to Mr. Kirkwood's recollection, the roadway into his father's home was used six or seven times. He had walked the road in 1964 and said that at that time it was in grass. He described it at that time as being about twelve feet wide and said that it was visible to those persons who knew that it was there but he could not say whether or not persons who were ignorant of its existence would have observed it. He did say that there was a slight depression in the ground where the road ran and indicated on an exhibit the location of the depressed area which was approximately where the road was indicated on Mr. Podolak's plat.

"Mrs. Winkles said that she had been born forty-three years ago and a block away from the property which she and her husband now occupy. As a child she remembered the Haines, Schotta and Kirkwood properties. She, with other children, would ride on the bread truck back to the houses on the properties. The road from Fells Avenue forked and one part ran easterly between the Haines and Schotta homes and the other went into the rear of the Kirkwood property. That part leading into the Kirkwood property was grown up in weeds and grass when she and her husband bought the property. They measured off the course of the driveway in March or April, 1971 and had it leveled out and graveled. Thereafter they moved into the house and used the driveway for deliveries. They also used it to go to and from work and their visitors used it. On November 6, 1971, Mr. Dilman, who

was bulldozing and grading for Mr. Amabile, knocked on the door. He had already moved a large pile of earth onto the other end of the roadway entering into Fells Avenue and this prevented Mr. and Mrs. Winkles from getting their blue and white Chevrolet out. It is still sitting in their back yard. Both Mr. and Mrs. Winkles said that there was an indentation in the ground which showed the location of the driveway before they had graded it. There were several other witnesses, Mr. C. Orman Manahan, an attorney, and Mr. William E. Pfeiffer, who testified as to the existence of a driveway into the rear yard of the property now owned by the Winkles. Mr. Manahan observed it in 1943 or 1946 and Mr. Pfeiffer observed it during the period from 1954 to 1966."

The trial judge then summarized the testimony of the Amabiles' witnesses who had indicated that at various times they had not observed the small piece of the roadway leading to the Winkleses' property from the Fells Avenue - Court House Drive roadway. He then found that the right of way referred to in the deeds was located as indicated on the two plats hereinbefore mentioned and that the Winkleses were entitled to use these rights of way as an easement appurtenant to their property and as a means of egress from and ingress to their property from Fells Avenue. After making the determination that the Winkleses were entitled to use the right of way as described, he directed the parties to produce further testimony as to whether the mistake of the Amabiles was innocent so as to entitle them to the benefit of the rule set out in *Easter v. Dundalk Holding Co.*, 199 Md. 303, 305, 86 A. 2d 404 (1952):

"The courts aim to avoid the granting of injunctions when they would produce injustice, great hardship, or public or private mischief. Thus it is an accepted rule that where a landowner, by innocent mistake, erects a building which encroaches on adjoining land, and an injunction is sought by the owner of

the land encroached upon, the court will balance the benefit of an injunction to the complainant against the inconvenience and damage to the defendant, and where the occupation does no damage to the complainant except the mere occupancy of a comparatively insignificant part of his lot, or the building does not interfere with the value or use of the rest of his lot, the court may decline to order the removal of the building and leave the adjoining landowner to his remedy at law."

*See also, Dundalk Holding Co. v. Easter*, 215 Md. 549, 137 A. 2d 667 (1958), *cert. denied*, 358 U. S. 821.

He summarized the testimony received at the hearing on the nature of the Amabiles' mistake as follows:

"At this subsequent hearing, Bernard F. Goldberg, Esquire, Attorney at Law, testified that he had examined the title to the property purchased by Mr. and Mrs. Amabile, but that he did not issue a title certificate. He was not able to advise Mr. Amabile as to the location of the rights-of-way referred to in the deed which he had prepared, but he specifically recalled that he did discuss with him, at the time of settlement, that there were rights-of-way across the property which the Amabiles were buying. He was not requested to make an attempt to locate the course of these rights-of-way.

"Mr. William G. Rasch, III, a surveyor, testified that in 1966 he had surveyed the property subsequently acquired by Mr. and Mrs. Amabile in the spring of 1966 and prepared a survey plat. He was aware of the rights-of-way referred to in the title deeds but he was unable to locate them on the ground. Likewise, Mr. Gary Watts, another surveyor, who did the site plans for Mr. and Mrs. Amabile on March 11, 1970 and who used the

topographic survey prepared by Purdum and Jeschke, the firm of which Mr. Rasch was a member, said that he was unable to locate the rights-of-way on the ground.

"Harry M. Ashman, Esquire, the attorney for Mr. and Mrs. Winkles, testified that they had employed him with respect to the question of the rights-of-way. He wrote a letter which was referred to in the opinion of this Court. As a result of this letter, in September or October, 1971, there was a meeting on the Amabile property at which Mr. Amabile was present, along with Mr. Cohen, his attorney, and Mrs. Winkles and Mr. Ashman. At that time, according to Mr. Ashman, no apartments had been built on the property and there was a road from the Winkles property to Fells Lane. The meeting was held to discuss the right of Mr. and Mrs. Winkles to cross the Amabile property which at that time was being graded. Mr. Ashman told Mr. Amabile and his counsel that the right of the way of the Winkles was being bulldozed. The course of the right-of-way, as claimed by Mr. and Mrs. Winkles was pointed out to Mr. Amabile. *Mr. Amabile made the statement that it was his property and that he could do with it what he wished.* (Italics added)

"Mrs. Winkles testified that she had several discussions with Mr. Amabile, the first of which took place on her front lawn in August of 1971. At that time Mr. Amabile was in the company of three or four persons whom she understood to be surveyors. She got her deed and showed Mr. Amabile where her right-of-way was and on which she and her husband had just put crushed stone. Mr. Amabile told her that he thought they could come to some agreement. According to her, she and her husband had arranged to have the roadway leading from their property line graded and surfaced with crushed stone in March, 1971.

"J. Fred Cohen, Esquire, one of the attorneys for Mr. Amabile, testified that Mr. Ashman's letter to Mr. Amabile had been forwarded to him and he arranged for a meeting which took place after November 17, 1971. At that meeting Mrs. Winkles claimed that her right-of-way went through the middle of Mr. Amabile's property. Mr. Amabile said that he would give an alternative way out for Mr. and Mrs. Winkles. At that time the buildings were under construction on the Amabile property. Mr. Cohen advised his clients to go ahead and close the roadway which Mr. and Mrs. Winkles claimed was their right-of-way but to leave a way for Mr. and Mrs. Winkles to get out to Fells Lane.

"*Mr. Amabile* did not testify at this subsequent hearing but it will be recalled that he testified at the earlier hearing that he *did observe the roadway* which Mr. and Mrs. Winkles claimed was their right-of-way leading from their home to a roadway from Court Avenue to Fells Avenue and that he made this observation *before he started grading the property*. He consulted his attorneys but he did not hold up the work he was doing on the property to wait for answers. He had also spoken to Mrs. Winkles while she was standing on the roadway in question and reported that she had said to him, 'This is my property; I don't want anyone to run over it.' Despite what Mr. Amabile observed and heard, he began his grading operations and proceeded to bulldoze away the road which Mr. and Mrs. Winkles had put in." (Italics added)

Judge Macgill found that the actions of the Amabiles were not innocent within the meaning of *Easter v. Dundalk Holding Co., supra,* and directed that an injunction issue requiring the Amabiles to remove all obstructions on the right of way.

## I Right of Way Established

The trial judge found that the right of way was used more or less continuously from about 1920 until its use was blocked by the Amabiles in November of 1971. His findings are supported by the evidence. The Amabiles argue for reversal because there was no evidence produced showing the existence of the roadway in 1908 when the original tract of land was divided. To support this argument they rely on *Hancock v. Henderson*, 236 Md. 98, 202 A. 2d 599 (1964). We agree with the trial judge that *Hancock v. Henderson* is distinguishable because it turned on the fact that the deed allegedly creating the right of way did not indicate a clear intent to do so. In that case the Court said:

> "The deed contained no express grant of a particular road in fee, or an easement therein, but the 'together clause' was slightly different from the usual form and read as follows: 'Together with all and every, the rights, alleys, ways, waters, privileges, appurtenances and advantages, *outlets or roadways*, to the same belonging or in anywise appertaining.' (Emphasis added.)"

> * * *

> "Even if we assume the phrase 'outlets or roadways' found in the deed were sufficient to convey an easement, failure of the appellees to prove the roadway was in existence or was agreed upon as a right of way in 1911 is fatal to substantiate an express grant of an easement. The rule that an easement conveyed in general terms may ultimately become fixed by metes and bounds through express agreement of the parties or by their actions was indeed stated in the *Sibbel* case in the form of a direct quotation from 28 C.J.S., *Easements*, Section 82. The principle had, however, been previously approved in this State in *Stevens v. Powell*, 152 Md. 604, 137 Atl. 312. But that rule presupposes a clearly indicated intention of the

parties, or at least of the grantor, to convey an easement. Such intention is thereafter made manifest in the conveyancing instrument, albeit in general rather than specific language. Such is not the case here. In the early yet still important case dealing with easements, *Oliver v. Hook*, 47 Md. 301, 308, the opinion writer, referring there to a general 'together clause' said this:

'If apt and appropriate terms had been used in the deed, such as "with the ways now used," or "used with the land hereby conveyed," they would have passed the right to such ways as had been actually used in connection with the part granted; not, however, as existing easements, but those terms would have operated to create new easements, for the benefit of the estate granted.'

"Since the appellees failed to prove the disputed roadway was in existence at the time of the severance of the parcel they now own, this claim of an express grant must also fail." *Id.* at 100, 101-102.

The appellant attempts to give this language, especially the last sentence, a meaning which was clearly not intended by the Court. In *Hancock*, the Court was dealing with a situation in which the intent to grant an easement was at the least unclear. It was in this context that they discussed the importance of the existence of the roadway at the time of the original division of the property. They determined that the failure to show that the roadway existed at the time of the original division of the property was fatal to the complainants' attempt to prove an intent to grant an easement.

The 1908 deed, as set out herein in note 2, however, clearly shows an intent to create an easement. The fact that the way may not have been in existence at that time is therefore not crucial.

As the court in *Hancock v. Henderson, supra,* recognized,

*Sibbel v. Fitch*, 182 Md. 323, 327, 34 A. 2d 773 (1943) and *Stevens v. Powell*, 152 Md. 604, 137 A. 312 (1927) stood for the proposition that:

> "This principle of law is well settled, and after the location of the right of way which has been granted in general terms has been defined and fixed by the owners of the dominant and servient tenements by user in a particular location over a long period of time, it becomes as definitely established as if the grant or reservation had so located it by metes and bounds and the location of the right of way as thus defined can only be changed by agreement of the owners of the dominant and servient tenements." *Sibbel, supra* at 327.

This proposition has been applied more recently in *Millson v. Laughlin*, 217 Md. 576, 142 A. 2d 810 (1958):

> "The general rule is that where the location of an easement has been established by grant, by agreement or action of the owner of the servient tenement, in case of an implied grant, it may not be changed except by mutual agreement — 28 C.J.S. 763, Sec. 84, *Greenwalt v. McCardell*, 178 Md. 132, *Sibbel v. Fitch*, 182 Md. 323, 328." *Id.* at 584.

The essence of the rule as applied to the instant case is that where, as here, the intent of the original parties to create an easement is clear while the exact location of the easement is not, the location of the easement may be fixed by the acquiescence of the servient estate holders in the actual use of the easement by the dominant estate.

## II The Remedy

The Amabiles first contend the decree was in error because it made reference to the Podolak plat, described above, which shows only a portion of the right of way and not the entire length thereof. The argument is well taken

because it is true the decree makes reference only to that plat. The opinion of the chancellor however made reference to not only the Podolak plat but also to the Purdumn and Jeschke plat, also described above, which shows the remainder of the right of way leading to Fells Avenue. We shall direct that the decree be modified to conform to the trial court's opinion.

If, in fact, the original roadway was not as shown on these plats the Amabiles are in no position to complain because the record shows they deliberately destroyed all existing evidence of the roadway after receiving notice of the Winkleses' claim. In *Hanley v. Stulman*, 212 Md. 273, 129 A. 2d 132 (1957) the Court of Appeals said:

> "The appellee, Edmondale, during the early months of 1955, began grading operations on the portion of its said property on which said road, or way, was located. On May 9, 1955, before grading operations had reached said road, Claude S. Hanley, one of the appellant's co-tenants, notified the appellee, Leonard Stulman, President of the other appellee, by letter that any attempt to close said road would be vigorously opposed by him and other interested parties, and on the same date had a professional photographer take a series of pictures of said road, showing its condition as of that date. Despite the aforesaid notice to the appellee, Leonard Stulman, the appellees continued grading operations and completely blocked and destroyed a portion of the aforesaid road and rendered it impassable."

> "[T]he Chancellor determined that he could grant no relief due to the fact that he could not, from the evidence, place 'the complete and exact location' of the road, where it is not connected on appellant's Exhibit No. 1, set forth below. He held that even though the appellee had wrongfully destroyed the road, and the appellant and the public improperly had been deprived of its use, the appellant had not met the burden of 'establishing by his evidence the

exact location, description, width and course of the entire road.' * * *"

* * * "The arm of an Equity Court is not so short, nor its authority so impotent, that it must permit a defendant to evade, with impunity, the broad and salutary principle of law that one cannot profit by his own wrongdoing. There is an ancient maxim in Equity that says: 'Equity will not suffer a wrong without a remedy'. This principle, which is the somewhat restricted application to the equity jurisprudence of the more comprehensive legal maxim, *Ubi jus, ibi remedium,* is the source of the entire equitable jurisdiction. It is subject to certain limitations, none of which are applicable here. *Pomeroy's Equity Jurisprudence,* pars. 423, 424." *Id.* at 275, 276-77.

The Amabiles attempt to distinguish *Hanley v. Stulman, supra,* on the basis that the Winkleses improved a portion of their right of way and thus were the first to destroy evidence of where the old road had been located. The argument is not well founded because here the evidence established that the Winkleses' improvements were in the old road and did not make precise locations impossible, whereas, the Amabiles' grading and construction did make precise locations impossible.

The Amabiles attempt to distinguish *Lichtenberg v. Sachs,* 213 Md. 147, 131 A. 2d 264 (1957) on the basis that there the construction proceeded in defiance of an injunction. While in *Lichtenberg* the defiance of the claims of the dominant owner was more flagrant than in the instant case, there was ample evidence here that the Amabiles proceeded with utter disregard of the Winkleses' rights. We note particularly the summation of the trial testimony quoted above where despite the fact that the location of the right of way was pointed out to Mr. Amabile, he stated ". . . it was his property and that he could do with it as he wished."

Although the Amabiles' counsel and surveyors stated they

could not precisely locate the right of way, all agreed that the Winkleses had one. Thus *Dundalk Holding Co. v. Easter*, *supra*, relied on by the Amabiles, is not applicable. The distinction is made clear from the following quote from that case:

> "A leading surveyor of the City had been employed to draw the description in the deed to Dundalk, and Dundalk relied on that description in building the wall. The ejectment case went to the jury on the conflicting testimony of the surveyor on whom Dundalk had relied and on that of other surveyors employed by Easter, and the jury resolved this difference of professional opinion in favor of Easter. There was nothing in that phase of the case to show that the mistake had been other than innocent and resulted from reliance on the work of an expert who later was thought by a jury to be wrong." *Id.* at 557.

Unlike the Amabiles, Dundalk relied on his surveyor before, and not after, he had knowledge of the adverse claim. The proper rule to apply to the instant case is found in *Columbia Hills Corp. v. Mercantile Safe Deposit and Trust Co.*, 231 Md. 379, 190 A. 2d 635 (1963):

> "Under these circumstances, the important question in the instant case is whether the easement was apparent to appellant, which is purely one of fact. Judge Macgill in his opinion, carefully analyzing the evidence, found that appellant's officers did have notice of the use of the relocated entrance so as to put the appellant on inquiry as to the rights of the appellee, and were charged with notice of such rights. Our review of the record before us shows that it supports his finding. Moreover, the notice to and knowledge of the physical existence of the relocated right-of-way on the part of the appellant, as found by the chancellor, makes immaterial the omission of the State Roads Commission in failing to record the

deed of easement and plat of 1951 until 1957." *Id.* at 381.

Further inquiry in the instant case would have revealed the evidence on which the Winkleses relied and which was found by the chancellor, and by us, to be adequate to support their claim. The Amabiles proceeded at their peril; they cannot now be heard to claim innocence. We are not impressed with the Amabiles' further argument that further inquiry by the wrongdoer in the *Columbia Hills Corp.* case would have revealed a metes and bounds description, but further inquiry in the instant case would lead only to the location on the ground because from this a surveyor could at that time have readily furnished a metes and bounds description.

## III Demurrer

The Amabiles finally contend their demurrer to the Bill of Complaint should have been sustained because the right of way was not described with particularity. It is true that neither the bill nor the deeds attached as exhibits did more than give reference to a right of way 12 feet in width over the Amabiles' property. Paragraph 6 of the Bill of Complaint did, however, describe the right of way as "the aforesaid 12 foot right-of-way previously used by them and their predecessors in title, for ingress and egress" and alleged that "your complainants are unable to obtain access to the rear of their property . . . and there is no other means of vehicular access to your Petitioner's property."

The Court of Appeals in a somewhat analogous context stated, "Even though every particular circumstance is not stated, the bill will be held sufficient if it states the complaint with reasonable certainty, clearness and accuracy so as to apprise the defendant of the nature of the claim brought against him." *Smith v. Shiebeck,* 180 Md. 412, 420, 24 A. 2d 795 (1942). *See also, Hart v. Wagner,* 184 Md. 40, 44, 40 A. 2d 47 (1944).

In *Hart v. Wagner, supra,* the court, after reciting the general rule quoted above, added:

" 'General certainty' in equity pleadings is all that is necessary. *Story's Eq. Pl.*, Sec. 252, 3; *Mewshaw v. Mewshaw*, 2 Md. Ch. 12. In this connection it is also pointed out in the last cited authority that while there may be cases in which it is quite proper for parties to resort to demurrer, 'this mode of defense is viewed with suspicion and disfavor, as indicative of an unwillingness to meet the plaintiff's case. . . .' " *Id.* at 44.

Further explication was given to the rule in *Whiteley v. Schoenlein*, 183 Md. 590, 39 A. 2d 692 (1944), where the Court stated at 595:

"... it is not necessary to state minutely all the circumstances which may conduce to prove the general charge. These circumstances are properly matters of evidence."

We think the language of the Bill of Complaint quoted above, while not as exact as it might have been, was sufficient to give the Amabiles notice that what was claimed as a right of way was what had been used as such by the complainants and their predecessors. Our conclusion is borne out by the evidence developed during trial that Mr. Amabile, at least, had already observed the roadway.

### IV Modification of Decree

As we indicated above paragraph (1) of the decree is to be modified by adding the words:

"on a topographic plat prepared by Purdumn and Jeschke dated December 19, 1967 and also filed as an exhibit in these proceedings, and"

> *Decree to be modified, and as modified affirmed.*
> *Appellants to pay the costs.*